**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**SOUTH BEND DIVISION**

LESEA, INC., FAMILY BROADCASTING
CORPORATION and LESEA GLOBAL
FEED THE HUNGRY INC,

Plaintiffs,

      v.                                                                                  No. 3:18CV914-PPS/MGG

LESEA BROADCASTING CORPORATION,
LESTER SUMRALL, DR. JOHN W. SWAILS III,
and EDWARD WASSMER,

Defendants.

_____

LESTER SUMRALL and
THE LESTER SUMRALL FAMILY TRUST,

Counterclaim Plaintiff and Third-Party Plaintiffs,

      v.

LESEA, INC., FAMILY BROADCASTING
CORPORATION, LESEA GLOBAL FEED
THE HUNGRY, INC., LESEA BROADCASTING
OF SOUTH BEND, INC.,  LESEA BROADCASTING
OF INDIANAPOLIS, INC.,  LESEA
BROADCASTING OF TULSA, INC.,  LESEA
BROADCASTING OF HAWAII, INC.,  LESEA
BROADCASTING OF ST. CROIX, INC.,  WORLD
HARVEST BIBLE COLLEGE INDIANA CHRISTIAN
UNIVERSITY, INC., STEPHEN P. SUMRALL, DAVID
M. SUMRALL, ANGELA N. GRABOWSKI, ANDREW J.
SUMRALL, and ADAM SUMRALL,

Counterclaim Defendants and Third-Party Defendants.

_____

FRANK LESTER SUMRALL,

      Intervenor-Plaintiff,

v.

LESTER SUMRALL, Individually and
in his capacity as Trustee of
THE LESTER SUMRALL FAMILY TRUST,

Defendant.

**OPINION AND ORDER**

This protracted litigation involves a family dispute over control of the LeSEA

Christian ministries empire that expanded in the wake of evangelist Dr. Lester Frank

Sumrall's death in 1996.  When Dr. Sumrall passed in 1996, he was survived by three

sons: Stephen, Peter and Frank. Only Frank and Stephen remain alive today.  This

dispute involves the third generation of Sumralls—cousins feuding over their

grandfather's legacy. It started principally as a trademark case brought by LeSea against

Lester Leonard Sumrall, the oldest grandchild of Dr. Sumrall and the only son of Frank

Sumrall, and Lester's rival "LeSEA" organization. Lester responded with a shotgun

spray of counterclaims brought in the name of the Lester Sumrall Family Trust, a trust

Lester created through an assignment of rights from his father, Frank, and for which he

is the trustee.  [DE 170 at ¶¶2,3, 72-74.]

The Trust is pursuing a number of counterclaims against several LeSEA-related

companies and against his cousins and surviving uncle believed to be involved in their

operation. [*Id.*]  The focus of the Second Amended Counterclaim is recovery of the value

of the original works of Dr. Sumrall, including manuscripts, sermons, books, and

recordings. Causes of action asserted include an accounting under copyright law,

copyright infringement, unjust infringement, conversion and theft.  Now before me is an Emergency Motion to Restrain LeSEA from Demolishing the Church and To Restrain Assets, filed by the Trust.  The matter has now been fully briefed and, following an evidentiary hearing, is ripe for ruling.

The genesis of the motion lies in the parties' discovery in the case.  Under the orders of Magistrate Judge Gotsch, the Trust was to be allowed to inspect Dr. Sumrall's personal effects housed in the basement of the Christian Center Church, which was founded by Dr. Sumrall in South Bend, Indiana in the 1960's.  [DE 287 at 2-3.]  The inspection was ordered to occur by January 31, 2022, with the independent inspector to "document the inspection by video and photograph to be delivered to the parties along with a written inventory by February 11, 2022." [*Id.*]  The latter date was later extended to February 22.  [DE 303.]  Under Judge Gotsch's orders, LeSEA is "ORDERED to preserve all assets in its basement that constitute Dr. Sumrall's personal effects, property, or assets."  [DE 287 at 2.]

Plaintiff LeSEA made an undated settlement offer to Lester and the Trust, which the Trust alleges was received by Lester on January 6, 2022.  [DE 295 at 2.]  The settlement offer expired on Friday, January 7, 2022, and advised that if the offer was not timely accepted, LeSEA's Board of Directors would execute an attached resolution on Monday, January 10 at 9:00 a.m.  [DE 295-1.]  The resolution provided that within 90 days, LeSEA would "begin the process [of] transitioning to a new location" and "obtain no less than three independent bids to demolish all structures" on the LeSEA property

housing the Christian Center Church building.  [DE 295-1 at 5.]  The resolution clearly indicates the Board's intent, upon completion of the demolition, to list the real estate for sale.  [*Id*.]  The settlement offer was declined by the Trust, and the Board resolution was passed.

The Trust seeks a broad preliminary injunction that would enjoin LeSEA from moving or disposing of any assets, including the Christian Center Church building, all publishing equipment stored there, any books written by Dr. Sumrall, any video files of Dr. Sumrall, any business records relating to the use of Dr. Sumrall's works, and records of LeSEA's profits and donations received since Dr. Sumrall's death.  [DE 295-18 at 2-3.]  The Trust's proposed order would also, essentially, place LeSea in receivership by restraining the LeSEA entities' business operations, and only allowing limited monthly expenditures along with a monthly accounting to boot. [*Id.* at 3-4.]

The Trust argues that under copyright law as invoked by Counts I and II of the Second Amended Counterclaim, the Trust seeks an accounting and award of profits, and that restraint of LeSEA's assets is within the Court's authority on such claims.  [DE 295 at 4.]  The Trust notes that Dr. Sumrall held the registration of many copyrights on his works and that the Trust challenges many copyrights now registered to LeSEA.  [*Id.* at 8-10.] The Trust tells me that a one-third ownership interest in those copyrights should have passed to Frank under Dr. Sumrall's will, along with the approximately 300 unregistered works of Dr. Sumrall.  [*Id.* at 10.] According to the Trust, the

preliminary injunction is appropriate because LeSEA has been draining and disposing of assets for several years.  [*Id*. at 12.]

"[A] preliminary injunction is an extraordinary and drastic remedy, one that should not be granted unless the movant, *by a clear showing*, carries the burden of persuasion."  *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997).  The requirements for obtaining a preliminary injunction are familiar.  The Trust must show that "(1) [it] will suffer irreparable harm in the absence of an injunction, (2) traditional legal remedies re inadequate to remedy the harm, and (3) [it has] some likelihood of success on the merits."  *Camelot Banquet Rooms, Inc. v. United States Small Business Administration*, 24 F.4th 640, 644 (7th Cir.  2022).  If the Trust can meet these requirements,  "the court must then balance the harm the moving parties would suffer if an injunction is denied against the harm the opposing parties would suffer if one is granted, and the court must consider the public interest, which takes into account the effects of a decision on non-parties."  *Id*.

Although generally a court may not freeze a defendant's assets merely to preserve them for a plaintiff's potential recovery, a restraint on assets is available when a plaintiff seeks equitable relief.  *Grupo Mexicano de Desarollo, S.A. v. Aliance Bond Fund*, 527 U.S. 308, 325 (1999), citing *Deckert v. Independence Shares Corp.*, 311 U.S. 282, 288, 290 (1940).  *See also CSC Holdings, Inc. v. Redisi*, 309 F.3d 988 (7th Cir. 2002) (a suit seeking "an accounting and profits remedy" under the Cable Communications Policy Act is equitable in nature and permits an asset freeze to remain in place pending final

disposition of the case).  Frank and the Trust seek an accounting and disgorgement of profits from Dr. Sumrall's copyrighted works, equitable remedies available in  a copyright context.  [DE 170 at ¶¶87, 94.]  A preliminary injunction grants "intermediate relief of the same character as that which may be granted finally."  *De Beers Consol. Mines, Ltd. v. United States*, 325 U.S. 212, 220 (1945).  By implication then, a preliminary injunction is generally not available to govern "a matter lying wholly outside the issues in the suit."  *Id*.  *See also Black v. Friedrichsen*, No. 1:19-CV-307-TLS-SLC, 2022 WL 374502, at *2 (N.D.Ind. Feb. 8, 2022) (Springmann, J.)

## Likelihood of Success on the Merits

Because the preliminary injunction is sought under the authority of the Trust's claims under the Copyright Act, I focus on the likelihood of the Trust's success on those claims.  Under 17 U.S.C. §507(b), civil actions under the Copyright Act must be brought "within three years after the claim has accrued."  LeSEA contends that the Trust's copyright claims are barred because they were not brought within three years of Frank's having notice of competing claims of ownership of the copyrights.  [DE 298 at 13-14.] The Trust has alleged that "[f]rom the date of Dr. Sumrall's death in 1996 on, Stephen and Peter Sumrall (until his death on December 5, 2015) repeatedly represented to Frank and others that Dr. Sumrall wanted all of his assets to go to "the ministry", the LeSEA entities, which they controlled."  [DE 170 at ¶32.]  In his deposition taken on June 24, 2021, Frank Sumrall testified that, in 1996, his brother Stephen told him that their brother Peter had Dr. Sumrall's will, indicating that Frank has known since 1996

6

that there was a will.  [DE 298-22 at 7.]  In reply, without disputing the applicability of the three-year copyright statute of limitations, the Trust quotes portions of Frank's deposition that might support a finding that Frank didn't know about the existence of a will until 2017.  [DE 305 at 4-6.]

"[C]opyright claims premised on disputes about ownership accrue when plain and express repudiation of co-ownership is communicated to the claimant, and are barred three years from the time of repudiation."  *Consumer Health Information Corp. v. Amylin Pharmaceuticals, Inc.*, 819 F.3d 992, 996 (7th Cir. 2016) (internal quotation marks and citations omitted).  Even a claim ostensibly for copyright infringement is subject to this rule if "the core dispute is about copyright *ownership*" rather than infringing acts: "when the gravamen of a copyright suit is a contest over copyright ownership, the claim accrues when the claimant has express notice of a competing claim of ownership."  *Id.* (emphasis in original).  "Unlike an ordinary infringement case in which each infringing act is a discrete wrong triggering a new limitations period, ownership claims 'accrue only once,' when the claimant receives notice that his ownership has been expressly repudiated or contested."  *Id.* at 997 (quoting *Seven Arts Filmed Entertainment, Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254  (9th Cir. 2013)).

LeSEA argues that Counts I and II accrued in 1996 because Frank then learned that a will existed and that LeSEA went on with its use of Dr. Sumrall's works after his death without any compensation to Frank.  [DE 298 at 16.]  "Awareness that one is not receiving royalties also puts one on notice of the basis for a copyright co-ownership

claim." *Cooper v. NCS Pearson, Inc.*, 733 F.3d 1013, 1017 (10th Cir. 2013).  The Trust

maintains that Frank did not know of any will until 2017 because its existence was

fraudulently concealed from him.  But he claims to have been told repeatedly since his

father's death that Dr. Sumrall wanted everything to go to the ministry, which may

have constituted a repudiation of Frank's ownership interest in Dr. Sumrall's

copyrights, triggering the limitations period under copyright law.

The parties have not given consideration to the possibility that the claim for an

accounting arises under state law and is not subject to the three-year statute of

limitations provided in copyright law.  *Gaiman v. McFarlane*, 360 F.3d 644, 652 (7th Cir.

2004) ("When co-ownership is conceded and the only issue therefore is the contractual,

or in the absence of contract the equitable, division of the profits from the copyrighted

work, there is no issue of copyright law and the suit for an accounting of profits

therefore arises under state rather than federal law...And in that event the applicable

statute of limitations would be state rather than federal.").  *See also Doc's Dream, LLC v.*

*Dolores Press, Inc.*, 959 F.3d 357, 361 (9th Cir. 2020) ("Nimmer notes that such

'[a]ccountings between joint copyright owners are handled strictly under state law.'"

Citing *Nimmer on Copyright,*§ 14.10[B][1][b] at n.18); *Jordan v. Sony BMG Music*

*Entertainment Inc.*, 354 Fed.Appx. 942, 945 (5th Cir. 2009); *Cambridge Literary Properties,*

*Ltd. v. W. Goebel Porzellanfabrik*, 510 F.3d 77, 80-81 (1st Cir. 2007).   The threshold question

of co-ownership of the copyrights appears in this case to be one of the state law

governing rights of inheritance rather than any distinctly federal copyright question

8

such as about co-creation of the work.  Another possibility, one I raised at the preliminary injunction hearing, is that the doctrine of laches applies, rather than any statute of limitations, because an accounting is an equitable remedy.

The parties have not adequately analyzed these various possibilities.  Whatever doctrine of repose applies, I continue to have deep reservations that an action brought so long after Dr. Sumrall's death in 1996 is timely.  In a related litigation, the Indiana Court of Appeals has already found the efforts of Frank and the Trust to open a probate estate for Dr. Sumrall to be barred by laches.  [DE 126-2 at 6-9.]  The Trust's position on the issue is based on the claim that the existence of a will was only discovered by Frank in 2017.  But LeSEA offers contradictory evidence, raising a dispute of fact on the question.  [DE 298 at 15.] And even if Frank was unaware of the will at the time of his father's death, the alternative was that his father died intestate, in which case Frank would have had a legal claim of inheritance, being one of Dr. Sumrall's three sons who survived him, his wife having predeceased him.  In that event, Frank was also on notice of his potential rights of inheritance but took no action.

Conceding to vague assertions that Dr. Sumrall wanted everything to go the ministry came at a cost to Frank, and perhaps a legally enforceable one.  Hearing testimony from Lester Sumrall described Lester's execution of a Power of Attorney in January 2005 after Lester reported finding his cousin Andrew in their grandfather's former house, appearing to amass (if not loot) valuable objects. At that time, Lester did some internet research on wills and the law of intestate succession under Indiana law.

Lester testified that the purpose of the Power of Attorney was to authorize Lester to receive for Frank any household property of Dr. Sumrall's that might have passed to Frank. This is yet another juncture at which Frank was not only on notice, but actually considered, whether he had any legal rights in Dr. Sumrall's estate. Against this factual background, the strong possibility of a time bar to the Trust's copyright claims weighs significantly against a showing of a likelihood of success.

LeSEA also contends that, to the extent it was not the registered owner of a particular challenged copyright, the evidence will support the existence of an implied license from Dr. Sumrall for LeSEA's use of his works. [DE 298 at 17.] The Trust replies that an implied license cannot exist where there's a signed agreement to the contrary, but cites only that there were publishing agreements and copyright registrations, which can't generally be agreements to the contrary. [DE 305 at 9.] Copyrighted published works can certainly be the subject of an implied license, given that the copyright is the reason a license is necessary. LeSEA makes a persuasive argument that Dr. Sumrall created his works in furtherance of and on behalf of the mission of LeSEA, an organization that he founded as an evangelical Christian ministry. [DE 298 at 18.] LeSEA's articles of incorporation, many of the applicable publishing agreements, and Dr. Sumrall's own speeches and sermons on the subject of his ministry are cited in support. [*Id.*] A non-exclusive license may have been granted by Dr. Sumrall to LeSEA orally, or implied by the totality of their conduct over the years. *I.A.E., Inc. v. Shaver*, 74

F.3d 768, 775-76 (7th Cir. 1996); *Falcon Enterprises, Inc. v. Publishers Services, Inc.*, 438 Fed.Appx. 579, 581 (9th Cir. 2011).

LeSEA also argues that there can be no right to an accounting from the corporate LeSEA defendants where the Trust does not allege that any of them is a joint owner of the copyrighted works. [DE 298 at 21.] At the preliminary injunction hearing, counsel for the Trust reiterated its theory that Dr. Sumrall's copyright interests passed via his will in equal parts to his three children, and that the claim of entitlement to an accounting is based on Frank's standing as co-owner of the copyright. On the Trust's theory, then, Stephen and the heirs of Peter are the owners of the other 2/3 interest in Dr. Sumrall's works. But the Trust proposes the issuance of a preliminary injunction against defendants LeSEA Inc., Family Broadcasting Corporation f/k/a LeSEA Broadcasting Corporation, and LeSEA Global Feed the Hungry. [DE 295-18 at 2.] If the Trust does not acknowledge that any of these entities is Frank's co-owner in the copyrights, an accounting cannot be sought under copyright law on the basis of joint ownership.

For these several reasons, I am not persuaded that the Trust establishes a likelihood of success on the merits of Counterclaims I and II.

### <u>Adequate Remedy at Law – Irreparable Harm</u>

In support of an assertion that courts in copyright cases have "generally concluded that an asset freeze is appropriate to ensure that permanent equitable relief will be possible," the Trust cites two *trademark* cases, an area in which irreparable harm

is presumed in view of the potential damage to the trademark owner's goodwill resulting from infringement or counterfeiting.  [DE 295 at 12.]  "Irreparable harm, however, is not automatically established by a finding of copyright infringement." *Greg Young Publishing, Inc. v. Zazzle, Inc.*, No. 20-55812, 2021 WL 3702005, at *1 (9th Cir. Aug. 20, 2021).

The Trust makes overblown and unsupported allegations that the LeSEA companies have engaged in "petty threats to start destroying property and assets." [DE 295 at 11.]  For its allegation that LeSEA has been dissipating assets, the Trust cites eight transactions, most of which occurred prior to the filing of the Trust's claims in April 2019.  No showing is made that LeSEA's ability to satisfy a judgment was impacted by these transactions, or would be by any further ones.  The hearing included testimony from Andrew Sumrall, Peter's son and Lester's first cousin. Andrew is President of Family Broadcasting Corporation and a board member of both LeSEA, Inc. and LeSEA Global Feed the Hungry. He credibly testified to the financial advantages of the organizations's recent property sales, and did not indicate that any was a "fire sale" or in any way motivated by a purpose of dissipating assets that might otherwise be available to satisfy a judgment.  That the LeSEA companies sold properties for more than $31 million, and intend to sell the valuable South Bend real estate on which the church property sits, suggest a flush balance sheet rather than a cash-strapped one. Andrew Sumrall testified that the ability to use much of the proceeds of the various sales to pay down debt actually increased LeSEA's net assets.

What's more, no destruction of any potential evidence in this case is threatened. The personal property potentially pertinent to the case has already been carefully inventoried and catalogued.  LeSEA acknowledges its responsibility to maintain Dr. Sumrall's personal effects and "has no intention of destroying any personal property during the pendency of this case," whether or not it razes the church's buildings and sells the real estate.  [DE 298 at 24.]  The Trust has made no showing of any effort by or intention of LeSEA to hide assets or destroy property with possible relevance to this case.

To the extent the preliminary injunction is sought merely to safeguard LeSEA's assets for payment of a judgment, LeSEA cites *Grupo*'s sarcastic comparison of preliminary injunctions with state prejudgment remedies available through Fed.R.Civ.P. 64:  "Why go through the trouble of complying with local attachment and garnishment statutes when this all-purpose prejudgment injunction is available?"  [DE 298 at 25, n.9, quoting *Grupo*, 527 U.S. at 330-31.]  "For preliminary relief to be granted, the irreparable harm must also be likely."  *Michigan v. U.S. Army Corps of Engineers*, 667 F.3d 765, 788 (7th Cir. 2011).  The Trust's speculative assertions do not establish a threat of irreparable harm, much less a threat that such harm is likely.

### Balance of Harms

The Trust addresses the balance of harms by reference to the destruction of Dr. Sumrall's effects and other potential evidence.  [DE 295 at 14.]  But LeSEA has offered its assurance that it intends to comply with the preservation orders already in place,

and that its plans to demolish the buildings and sell the real estate carry no threat to the buildings' contents.  The Trust's assertion that the receivership-style limitations it seeks would permit LeSEA "to carry on their ordinary business operations," appears either disingenuous or naive in the extreme.  [*Id*. at 15.]

To the contrary, LeSEA persuasively enumerates significant practical harms that it would suffer from what it calls a "hostile takeover, something Lester has been trying to accomplish for many years."  [DE 298 at 27.]  These include disruption of LeSEA's plans to "right-size" its church building to the requirements of its current congregation, the potential inability of FBC to broadcast and the possible relinquishment of its FCC license, and interruption of Global Feed the Hungry's charitable mission directed to combating hunger worldwide.  The transfer of financial control and oversight of all three entities to the Trust would be a perverse result, because Lester and the Trust are plainly hostile to LeSEA, lack an understanding of the operations of the three LeSEA entities, and Lester is actually a judgment-debtor to LeSEA based on the outcome of one of the several previous litigations between them.  LeSEA points out that the Trust refers to the real estate as LeSEA's "primary asset" [DE 295 at 3]. Yet the Trust refused the settlement offer that would have transferred the real estate to the Trust, along with all rights in and to the Works.  [*Id*.]

The balance of harms works on a sliding scale such that "[t]he more likely the plaintiff is to win, the less heavily need the balance of harms weigh in his favor; the less likely he is to win, the more need it weigh in his favor." *Valencia v. City of Springfield*,

14

883 F.3d 959, 966 (7th Cir. 2018).  Here, for the reasons stated above, I believe the Trust's likelihood of success is low. And the balance of harms greatly favors LeSea in any event.

For the sake of completeness, I note that, when appropriate, the "balancing process should also encompass any effects that granting or denying the preliminary injunction would have on nonparties (something courts have termed the public interest)." *Cassell v. Snyders*, 990 F.3d 539, 545 (7th Cir. 2021) (internal quotations and citations omitted). Here, the balancing becomes a landslide when the public interest is considered. The Trust speaks of public charities being "looted by officers, shareholders, and family members," but this ugly hyperbole is not supported by further explanation, much less any evidence of self-dealing by LeSEA stakeholders. In opposition, LeSEA persuasively contends that disruption of the operations of two charitable organizations and a church are not in the public interest, particularly operations that provide "*daily* meal rations to approximately 400,000 orphaned and vulnerable children across 23 of the world's least developed nations," 300 tons of food shipped internationally each month, and over one million pounds of food supplies provided each month to community organizations in the United States.  [DE 298 at 28.] In short, the balance of all harms—both public and private—in this case strongly favors LeSea and disfavors the Trust.

15

**Conclusion**

As I indicated at the hearing, the motion for a preliminary injunction is denied. I described the relief sought as almost breathtaking in scope, making what is already an extraordinary remedy even more extreme.  The Trust bears the burden of persuasion to make a clear showing of the basis for the relief with substantial proof.  *Mazurek*, 520 U.S. at 972.  After full briefing and a day of evidence, the Trust has not satisfied the requirements for the issuance of a preliminary injunction, and certainly not an injunction of the intrusive breadth and depth the Trust proposes.

**ACCORDINGLY:**

Counterclaim Plaintiff The Lester Sumrall Family Trust's Emergency Motion to Restrain LeSEA from Demolishing the Church and To Restrain Assets [DE 294] is DENIED.

**SO ORDERED.**

**ENTERED:  March 3, 2022.**

 **/s/ Philip P. Simon**
**PHILIP P. SIMON, JUDGE**
**UNITED STATES DISTRICT COURT**