# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF INDIANA
### SOUTH BEND DIVISION

LESEA, INC., FAMILY BROADCASTING
CORPORATION and LESEA GLOBAL
FEED THE HUNGRY Inc.,

Plaintiffs,

  v.            No. 3:18CV914-PPS/MGG

LESEA BROADCASTING CORPORATION,
LESTER SUMRALL, DR. JOHN W. SWAILS III,
and EDWARD WASSMER,

Defendants.

_____

LESTER SUMRALL and
THE LESTER SUMRALL FAMILY TRUST,

Counterclaim Plaintiff and Third-Party Plaintiffs,

  v.

LESEA, INC., FAMILY BROADCASTING
CORPORATION, LESEA GLOBAL FEED
THE HUNGRY, INC., LESEA BROADCASTING
OF SOUTH BEND, INC.,  LESEA BROADCASTING
OF INDIANAPOLIS, INC.,  LESEA
BROADCASTING OF TULSA, INC.,  LESEA
BROADCASTING OF HAWAII, INC.,  LESEA
BROADCASTING OF ST. CROIX, INC.,  WORLD
HARVEST BIBLE COLLEGE INDIANA CHRISTIAN
UNIVERSITY, INC., STEPHEN P. SUMRALL, DAVID
M. SUMRALL, ANGELA N. GRABOWSKI, ANDREW J.
SUMRALL, and ADAM SUMRALL,

Counterclaim Defendants and Third-Party Defendants.

_____

## OPINION AND ORDER

Dr. Lester Frank Sumrall was a Christian missionary, evangelist, pastor and author who died in 1996 after decades of far-reaching and successful ministry, during which he produced many dozens of publications and broadcasts.  At the time of his death, Dr. Sumrall was a widower and the father of three children — Frank, Stephen and Peter, each of whom had children of their own ("the grandchildren"). This litigation coming more than 20 years after Dr. Sumrall's passing results from disputes among the grandchildren concerning ownership and control of Dr. Sumrall's assets and legacy.  That legacy takes the form of three non-profit entities spawned from Dr. Sumrall's founding of the Lester Sumrall Evangelistic Association or "LeSEA."  These three entities, the original plaintiffs in this action, are LeSEA, Inc., Family Broadcasting Corporation, and LeSEA Global Feed the Hungry, Inc. After nearly five years of litigation, what remains are certain claims asserted by Dr. Sumrall's oldest grandson Lester Sumrall, acting on his own behalf or as trustee of a trust representing the interests of his father, Frank. (To avoid confusion, I will refer to the grandson as "Lester" to differentiate him from his grandfather of the same name).

To say the least, this case has a tortured history. The original lawsuit brought by the LeSEA entities under the Lanham Act and on numerous other claims settled with the entry of a permanent injunction. [DE 331, 332, 334.] What remained were a slew of counterclaims filed by Lester and the Trust and which are set out in the Second Amended Counterclaim. [DE 170.] In an effort to clearly delineate what claims were still

active, on January 17, 2023 I issued an order [DE 334] setting forth the claims that I believed were still pending.  No one objected to my order clarifying the third-party claims and counterclaims. Here they are, in summary:

- Count I for an Accounting for Use of Dr. Sumrall's Works, brought by the Trust against the counterclaim defendants LeSEA, Inc., Family Broadcasting Corporation, and LeSEA Global Feed the Hungry, Inc., and the individual third-party defendants Stephen P. Sumrall (Lester's uncle) and David M. Sumrall, Angela Grabowski, Andrew J. Sumrall, and Adam Sumrall (all of whom are Lester's cousins).

- Count II for Copyright Infringement , by the Trust against the counterclaim defendants.

- Count IV for Tortious Interference with Expectancy,  by the Trust against the counterclaim defendants and the individual third-party defendants.

- Count V for Unjust Enrichment, by the Trust against the counterclaim defendants and the individual third-party defendants.

- Count VIII for Common Law Fraud, by the Trust against the third-party defendants.

- Count X for Copyright Infringement, brought by Lester Sumrall against the counterclaim defendants.

Now before me are four motions for summary judgment challenging these remaining claims.  This opinion will address the two motions which concern the five claims brought by the Trust that represents the interests of Frank Sumrall.  For simplicity's sake and unless specificity requires otherwise, I will use the generic "LeSEA" to describe collectively the three related entities — LeSEA, Inc., Family

3

Broadcasting Corporation and LeSEA Global Feed the Hungry, Inc.  Unless clarified in context, the term will also encompass the individual third-party defendants.

LeSEA seeks judgment as a matter of law on the five remaining counterclaims the Trust has against them, namely Counts I, II, IV, V and VIII.  This opinion will also address the Trust's affirmative motion for partial summary judgment seeking to knock out LeSEA's statute of limitations defense to Count IV, the claim for tortious interference with expectancy.   To be addressed in a separate opinion are two other motions concerning Lester Sumrall's individual copyright infringement claim (Count X) relating to what is called the "Traveler" photograph.

## **Undisputed Facts**

In 1957, Dr. Lester Sumrall, a Christian missionary, founded LeSEA, Inc., formerly known as the Lester Sumrall Evangelistic Association, Inc.  [DE 362 at ¶1.]  As set forth in LeSEA's Articles of Incorporation, signed by Dr. Sumrall, LeSEA's purpose was to "teach and propagate the Holy Bible and Christian Worship" by, among other things, "publish[ing] all types of Christian literature for sale, subscription and for free distribution, all profits to revert to [LeSEA]."  [*Id*. at ¶2; DE 337-2 at 2-3.]  Until his death in 1996, Dr. Sumrall authored numerous written works ("the Works").  [DE 362 at ¶3.]

Dr. Sumrall wrote in his office on LeSEA's premises and in a parsonage owned by LeSEA.  He also wrote during his extensive travels for missionary and charitable purposes, and was seen writing book ideas on napkins, when traveling in cars, and while staying in hotel rooms around the world.  [DE 362 at ¶4; DE 369 at ¶151.]

Under some publishing agreements, Dr. Sumrall directed the publishers to register the copyright in the subject work to LeSEA and to pay royalties to LeSEA. [DE 362 at ¶6.] Under other agreements, Dr. Sumrall directed that the publisher pay all royalties to LeSEA but was either silent with respect to copyright registration instructions or specified personal ownership. [*Id*. at ¶7.] Still other publishing agreements included instructions that royalties be paid to Dr. Sumrall and that the publisher file copyright applications in Dr. Sumrall's name or were silent on the point. [*Id*. at ¶8.] Works that were not subject to publishing agreements were published by LeSEA's in-house publishing division under Dr. Sumrall's direction, and corresponding copyrights were sometimes registered to LeSEA, sometimes registered to Dr. Sumrall, and sometimes not registered at all. [*Id*. at ¶9.] LeSEA also published books by many other authors. [DE 369 at ¶109.]

Of the Works at issue in this matter, 23 were registered with the United States Copyright Office to LeSEA. [DE 362 at ¶10.][1] Another 45 Works were registered personally to Dr. Sumrall, although the registrations of two of those Works have expired. [*Id*. at ¶¶11, 12.] The remaining Works, more than 250 in number (as identified by the Trust in Exhibit A to its Second Amended Counterclaim) are unregistered. [*Id*. at ¶14; DE 170 at ¶26; DE  170-1.]

---

[1] While the Trust admits LeSEA's assertion that this number is 23, LeSEA also agrees with the Trust's separate assertion elsewhere that LeSEA is listed as the copyright claimant on 24 copyright registrations. [DE 369 at ¶96.] The inconsistency is not critical for present purposes.

Dr. Sumrall and LeSEA did not have a signed employment agreement or a work-for-hire agreement.  [DE 369 at ¶99.]  On his tax returns from 1969 to 1993, Dr. Sumrall identified himself as a 1099 sole proprietor and/or independent contractor for tax purposes.  [DE 369 at ¶100.]

Some publishing agreements executed by Dr. Sumrall directed royalties to be paid to him personally, but later contracts for the same titles executed after Dr. Sumrall's death directed royalties to be paid to LeSEA.  [DE 369 at ¶80; .DE 363-7.]   No undisputed evidence has been presented to establish that LeSEA received 100% of the royalties for Dr. Sumrall's publications, regardless of the instructions in the publishing contracts.  What the evidence does establish is that even if a publishing contract provided that royalties would be paid to Dr. Sumrall, the publisher at times would send a royalty check made payable to LeSEA. [DE 337-3, DE 337-4.]  There is also evidence that, when he received a royalty check payable to him personally, Dr. Sumrall would sometimes opt to endorse the check over to one of his ministries.  [DE 364-16.]  But there is also evidence that Dr. Sumrall's personal secretary would sometimes take royalty checks to Dr. Sumrall's bank for deposit into his personal account.  [DE 364-15 at 12-13.]  Dr. Sumrall preached that he gave all of his assets to the ministry and owned nothing, applying all royalty checks he received to feed the hungry.  [DE 362 at ¶19.]

Dr. Sumrall purchased his home but then donated it to LeSEA and continued to live in it as a parsonage.  [DE 369 at ¶159; DE 362 at ¶20.]  LeSEA owned the automobile Dr. Sumrall drove.  [DE 362 at ¶20.]  For a time, Dr. Sumrall was paid a salary, but for at least the last 10 years of his life he did not receive a salary but was given the proceeds of

free will or "love" offerings collected at LeSEA's Christian Center Church twice a year (around his birthday and Christmas).  [DE 362 at ¶21; DE 369 at ¶160.]

In 1972, Dr. Sumrall founded Family Broadcasting Corporation to broadcast "family inspirational programming," a mix of family-friendly sitcoms and Christian teaching programs.  [DE 362 at ¶23; DE 337 at ¶13.]  FBC produced the *Dr. Sumrall Teaching Series*, an original weekly television program featuring Dr. Sumrall delivering sermons.  The production was overseen by grandson Peter Sumrall, an FBC employee. [DE 362 at ¶24.]  Each video episode was produced and owned by FBC, utilizing a production crew of 5 to 6 FBC employees.  [*Id*. at ¶25.]

Dr. Sumrall described FBC as follows:

> We produce teaching series on many subjects.  They are shown regularly on television and recorded on videotape for use in our Bible college and video schools around the country...Today we are the best equipped television facility in the state of Indiana, with several million dollars worth of the best electronic gear available...From this station we began our cablevision ministry.  This arm has reached out until our programs are now on over one hundred television outlets.  Through other satellite networks we reach virtually every state in the country[.]

[DE 362 at ¶30; DE 337-6 at 3-5.]

In his book *My Three Sons*, Dr. Sumrall described the LeSEA organization and his relationship to it this way:

> In South Bend, where we have the headquarters of the Lester Sumrall Evangelistic Association, Inc. (LESEA, Inc.), we have a church, a Bible school, and a publishing ministry.  In addition, in South Bend and Indianapolis we own two television stations.  All this was built from nothing, and today it is of great worth.  Yet I own none of it personally.  It is all in a non-for-profit corporation in which the investment is used exclusively to broadcast the gospel and to win souls to Christ.

> Today when I travel and speak as an evangelist and Bible teacher, I
> often return to South Bend with offerings of several thousand dollars.
> This money goes into the world outreach ministry.

[DE 362 at ¶31;DE 337-at 6.]

Dr. Sumrall's son Stephen has testified concerning Dr. Sumrall:

> [I]n the front of his bible he wrote a statement that was his belief that says:
> "If I die rich I die a traitor to the cause of Christ and to the Gospel."
>      And so on purpose he didn't own a house.  On purpose he had no
> car.  On purpose he didn't own anything, and late in life refused a salary,
> and so it was not by accident those things happened.  They happened
> because it went by his own wishes that he decided to live the way that he
> wanted to live, and so his life was ministry.  There was nothing else that
> interested him at all.

[DE 362 at ¶32; DE 336-2 at 21.]  Dr. Sumrall's grandson David gave similar deposition

testimony:  "The way my grandfather lived was everything he had was the church's."

[DE 362 at ¶33; DE 336 -7 at 14.]

Dr. Sumrall was Chairman of the Boards of LeSEA and FBC until his death in

1996.  At the time of Dr. Sumrall's death, his son Stephen was president of LeSEA and

his son Peter was president of FBC.  [DE 362 at ¶34.]  LeSEA Global Feed the Hungry,

formerly a division of LeSEA, did not become an independently organized entity until

2003.  Stephen departed around 2005, and Peter assumed the roles of President of

LeSEA and LeSEA Global (in addition to FBC) until his death in 2015.  [*Id*. at ¶35.]

Frank, the third brother and son of Dr. Sumrall, served as an associate pastor at

LeSEA after voluntarily resigning from the board in 1990.  [*Id*. at ¶36.]  Sometime in the

early 2000's, Frank resigned from his associate pastor position with LeSEA and moved

to Florida because "the call in [his] life was greater than just LeSEA."  [*Id*. at ¶37; DE 336-3 at 16.]

FBC and LeSEA Global have historically purchased copies of Dr. Sumrall's Works from LeSEA.  [DE 362 at ¶38.]  FBC sometimes used the Works it purchased as incentives to donate at certain levels in various donation campaigns.  [*Id*. at ¶39.]  Aside from such campaigns, LeSEA Global primarily distributed copies of the Works both domestically and abroad as part of its international relief efforts and as unsolicited gifts to donors.  [*Id*. at ¶40.]

Dr. Sumrall left a Last Will and Testament naming Stephen as executor.  [*Id*. at ¶41.]  The will directed that certain tangible personal property and any residuary be divided equally among his three sons.  [*Id*. at ¶42.]  The will empowered Stephen to "exchange, lease for any term..., mortgage, pledge, or otherwise deal for any purpose with the property, real or personal...for such consideration and on such terms...as [he] may determine"; "allot different kinds or disproportionate shares of property or undivided interests in property among the beneficiaries"; and "determine the value of any property distributed in kind."  [*Id*. at ¶43; DE 170-2 at 3-4.]  The will made no specific reference to intellectual property.  [DE 362 at ¶44.] The will did not direct any bequest to any LeSEA organization.  [DE364-14.]

From April 28, 1996 until April 25, 2017, the will was kept in a locked metal filing cabinet in the offices of LeSEA.  [DE 369 at ¶85; DE 363-12 at 6-7.]  The will was never probated.  [DE 362 at ¶45.]  Lester testified in his deposition that both Peter and Stephen

9

said that after his death, all of Dr. Sumrall's possessions belonged to the ministry.  [DE 369 at ¶88; DE 363-15 at 35 (p. 13, ℓℓ. 8-12).]

In May 2005, an assignment was executed to LeSEA Broadcasting Corporation from LeSEA, Inc. of "all right, title and interest in and to all of the published or unpublished written works of Dr. Lester Frank Sumrall, whether previously registered with the U.S. Copyright Office or not."  [DE 363-1 at 2.]  Neither LeSEA nor FBC carried the copyright as an asset on their books.  [DE 369 at ¶94.]

Stephen and Andrew always intended that LeSEA continue publishing the Works but neither has ever believed that they personally have any ownership interest in the Works.  [DE 362 at ¶46.]  To the extent either was a joint owner of the Works, during the pendency of this action both Stephen and Andrew have executed Copyright Licenses granting "to LeSEA a non-exclusive, royalty free, worldwide, license to reproduce, distribute, adapt (create derivative works based on the Works), publicly perform, publicly display, otherwise use, and sub-license, in any format or language, the Works."  [*Id.* at ¶47; DE 337-8 at 3, 6.]  Andrew's license was executed in December 2021 and Stephen's in February 2022.  [DE 337-8 at 4, 7.]

Frank's mental state has been deteriorating since at least September 2021 and he can no long correctly remember the past.  [DE 362 at ¶71.] For example, in his deposition, Frank Sumrall testified that in 1996 he knew that Dr. Sumrall had left a will. [DE 336-3 at 8  (p. 50, ℓℓ.19-24).] But later in the deposition, Frank testified that he believed his knowledge of the will was actually in 2017 rather than 1996. [DE 336-3 at 29

(p.122, ℓℓ.5-20).]  LeSEA employee Ken Gill knew about the will as of June 17, 1996, and Lin Jimison (Dr. Sumrall's personal secretary) was aware of it as of at least January 25, 1997.  [DE 362 at ¶49; DE 337-20 at 2; DE 337-19 at 2.]  According to an inventory of Dr. Sumrall's office from 1997, copies of the will were in his file cabinet.  [DE 362 at ¶50.] Frank testified that he did not believe that Adam, Andrew, Angela nor David (some of the grandchildren) ever concealed the will from him, and did not believe that any member of the family, LeSEA, or FBC had wronged him in any way.  [*Id*. at ¶¶51, 52.]

On January 18, 2005, Frank executed a notarized Power of Attorney that empowered his son Lester to receive a one-third interest in "the personal and household items left by my deceased father, Lester Frank Sumrall."  [DE 362 at ¶53; DE 336-8.]  This occurred after Lester advised his dad (Frank) that he discovered his cousin Andrew in Dr. Sumrall's former house, where he appeared to be gathering Dr. Sumrall's personal effects, and Lester had done internet research on intestate succession.  [DE 362 at ¶54.]

Eleven years later – sometime in late 2016, Lester and Frank met with Stephen for lunch, and Frank asked Stephen for a copy of Dr. Sumrall's will.  [DE 362 at ¶55.] Stephen responded that he would look for a copy of the will.  [*Id*. at ¶56.]  On March 9, 2017, Frank sent a text message to Stephen reiterating his need for a copy of the will, and Stephen responded that he would continue to look for it.  [*Id*. at ¶57.]  Stephen could not find a copy of the will.  [*Id*. at ¶58.]

On April 3, 2017, Lester – acting on behalf of Frank via the POA – filed a *Petition for Probate and Issuance of Letters of Administration and for Supervised Administration* in the St. Joseph County Probate Court in an attempt to open an estate for Dr. Sumrall.  [*Id*. at ¶61.]  In the petition, Lester indicated that Dr. Sumrall "reportedly died with a Will." [*Id*. at ¶62; DE 336-9 at ¶3.]  On April 21, 2017, granddaughter Angela Sumrall filed a *Petition to Deny Petition for Probate, etc.* with the probate court, providing a copy of the will and indicating that Dr. Sumrall's estate was insolvent "in that there are neither assets nor liabilities to administer."  [DE 362 at ¶63; DE 336-11 at ¶4.]  Stephen, David, Andrew and Adam consented to and joined Angela's petition.  [DE 362 at ¶64.]

On July 13, 2017, the Probate Court held an evidentiary hearing at which Lester (acting on behalf of Frank) argued his belief that Dr. Sumrall was the owner of intellectual property which LeSEA and FBC had been using and profiting from for more than 20 years.  [*Id*. at ¶65.]  Angela's Motion for Judgment on the Evidence was granted by the Probate Court, which found that Lester "presented no evidence of any asset or liability that presently exists that has not been distributed."  [DE 336-14 at 3.]

The Indiana Court of Appeals affirmed the Probate Court's decision.  [DE 336-15.]  Here's how the Court of Appeals described the Probate Court's evidentiary hearing:

> During the hearing, Appellant [Lester] questioned four witnesses and gave a lengthy narrative regarding assets that he claimed to have observed in either 1996 or 2005.  Appellant also discussed…certain copyright interests relating to the ministry….Appellant, however, did not provide any evidence proving that either the copy right interests or the paintings were part of the decedent's estate.  At the close of Appellant's

presentation of evidence, Appellee's counsel noted that Appellant did not
specify any assets that he believed were still in the estate and "admitted
that he had...concerns about assets moving in 2005" but did nothing to
address these alleged concerns until 2017.

[*Id*. at 5.]

The appellate court opinion further explained:

Appellant's delay can also be interpreted as an implied waiver of any
request for the establishment and administration of an estate.  Appellant
sat idly by and delayed in attempting to preserve any claimed interest that
he or his father might have had in the property.  This includes remaining
silent after coming to believe that some of the decedent's personal
property was moved or distributed in 2005.  His twelve years of silence
after allegedly learning that some of the property at issue had been
distributed suggests a knowing acquiesce [*sic*] – if not outright approval –
of the distribution.  Furthermore, even if it were possible to reacquire the
decedent's alleged personal property, doing so would undoubtedly result
in prejudice as it would create insurmountable evidentiary issues.

[*Id*. at 8.]  Neither Lester nor Frank took any further action with respect to the petition

for a probate estate.  [DE 362 at ¶70.]

\* \* \*

For a number of reasons, very few of the Trust's statements of fact offered on

these motions are incorporated into these the factual findings on which summary

judgment can be considered.  In a frankly astonishing number of instances, the Trust's

assertion of a fact is not supported by the evidence cited.  [*See, e.g.,* DE 369 at ¶¶75, 79,

81, 82, 83, 84, 104, 110, 111, 112, 115, 116, 130.] Counsel also has a likely sanctionable

habit of offering language in quotation marks that does not appear in the cited

evidence. [*See, e.g.,* DE 369 at ¶¶89, 90, 91, 123.]  In other instances the Trust's assertion

of fact is rejected for summary judgment purposes because LeSEA has successfully

demonstrated a dispute of the asserted fact by citing to contrary evidence in the record. [*See, e.g.,* DE 369 at ¶¶72, 82.] In still others, LeSEA has made meritorious objections to the admissibility of the evidence relied on by the Trust. [*See, e.g.,* DE 369 at ¶¶78, 83, 119; *id.* at p.17, n.2.]

Some of the Trust's assertions are not material to the issues presented. [*See, e.g.,* DE 369 at ¶¶86, 87, 125, 126, 127, 129, 131.] Some are legal conclusions or otherwise misplaced as assertions of material fact, such as the fact that an expert has given certain opinions. [DE 369 at ¶¶76, 100, 105, 150, 154.] An expert opinion itself may or may not be pertinent or admissible, but the *fact that* it was rendered is not a material fact that belongs in a Statement of Material Facts for purposes of Rule 56. [DE 369 at ¶105.] Over and over the Trust's citation to evidence of record lacks the required pincite, making it unworkable if not impossible to identify the portion of a multi-page document that ostensibly provides evidentiary support for a particular proposition. [*See, e.g.,* DE 369 at ¶¶79, 83, 97, 98, 100 (a 157-page exhibit).] I offer this summary of the reasons many of the Trust's assertions of fact are rejected in lieu of a more detailed analysis, which would produce an opinion of unreasonable length.

## Discussion

Summary judgment must be granted when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). A party opposing summary judgment may not rely on allegations or denials in his or her own pleading, but rather must "marshal and present the court with the

evidence she contends will prove her case." *Goodman v. Nat'l Sec. Agency, Inc.*, 621 F.3d 651, 654 (7th Cir. 2010). Summary judgment "is the put up or shut up moment in a lawsuit, when a party must show what evidence it has that would convince a trier of fact to accept its version of the events." *Springer v. Durflinger*, 518 F.3d 479, 484 (7th Cir. 2008).

**Laches as a Bar to Recovery on State Law Counterclaims**

At the end of LeSEA's brief in support of its motion for summary judgment, the doctrine of laches is invoked as an over-arching challenge to all of the Trust's claims. [DE 339 at 30.] In response to LeSEA's motion, the Trust fails to address the laches argument at all. [DE 361.] LeSEA seizes upon this, contending in its reply that summary judgment must be entered in its favor because the Trust has waived any arguments in opposition. [DE 368 at 5.] I am reluctant to simply rely on waiver. Therefore, I will consider on the merits whether laches is correctly applied to the Trust's remaining counterclaims against LeSEA — Count I for an accounting, Count II for copyright infringement, Count IV for tortious interference with expectancy, Count V for unjust enrichment and Count VIII for fraud.

Laches is an equitable defense that defeats a claim "when a party neglects to raise a known claim for an unreasonable period of time resulting in prejudice to the opposing party." *Barber v. State*, 141 N.E.3d 35, 41 (Ind.Ct.App. 2020). During the lapse of time, laches "requires some change of circumstances that makes the relief sought inequitable." *Id.* Movants have the burden of proving by a preponderance of the

15

evidence that the Trust, or Frank whose rights the Trust asserts, "unreasonably delayed in seeking relief *and* that [movants were] prejudiced by the delay." *Id.* (emphasis in original).

The elements of the defense of laches are "(1) inexcusable delay in asserting a known right; (2) an implied waiver arising from a knowing acquiescence in existing conditions; and (3) a change in circumstances causing prejudice to the adverse party." *SMDfund, Inc. v. Fort Wayne-Allen Cty. Airport Auth.*, 831 N.E.2d 725, 729 (Ind. 2005) (internal quotation omitted), quoted in *Richmond State Hospital v. Brattain*, 961 N.E.2d 1010, 1012 (Ind. 2012). As the Indiana Supreme Court explained in *Richmond State Hospital*, "[d]espite this structured test, '[t]here is no fixed or definite rule for the application of the doctrine of laches.'" *Id.* at 1012, quoting *Grantham Realty Corp. v. Bowers*, 22 N.E.2d 832, 839 (1939).

Dr. Sumrall died on April 28, 1996. Of course, Frank was aware of his father's death, aware that his mother had preceded Dr. Sumrall in death, and aware that he, Frank, was one of Dr. Sumrall's three surviving children. These facts can reasonably be expected to raise in Frank's mind the question whether he had any rights of inheritance in Dr. Sumrall's estate. The Trust now asserts that members of the family fraudulently advised Frank that Dr. Sumrall left everything to the ministry, suggesting that Frank was not due anything from Dr. Sumrall's estate. Whether or not such representations were made at that time, and whether or not they were true, in January 2005 Frank began to take action to determine his rights of inheritance, when he executed a Power of

16

Attorney appointing Lester to represent Frank for the purpose of receiving a "One

Third (⅓)  interest in the personal and household items left by my deceased father,

Lester Frank Sumrall."  [DE 362 at ¶53; DE 336-8.] Lester's research on intestate

succession prompted this action, which clearly signifies that, smelling a proverbial rat,

Frank then recognized his potential rights of inheritance.  But no further legal action

was taken at that time.  Not until 2016, eleven years later, did Frank (again with his son

Lester's assistance) attempt to further explore his rights in his father's estate by asking

Stephen for a copy of Dr. Sumrall's will.  Then in 2017, Frank, through Lester, filed the

petition with the St. Joseph County Probate Court in an attempt to open an estate for

Dr. Sumrall.

Even if we entirely disregard the delay by Frank in taking action from Dr.

Sumrall's death in 1996 to 2005, the claims now asserted in this case — brought by the

Trust in its original counterclaim filed April 19, 2019 [DE 43] — are inexcusably delayed

from Frank's earliest indication in 2005 that he sought rights in his father's estate.  The

same is true if the laches analysis credits Frank with the 2017 filing with the probate

court, or even the 2016 request for a copy of Dr. Sumrall's will.  This timeline

demonstrates a classic case of Frank sleeping on his rights for many years, a conclusion

that is not impacted by any determination about fraudulent behavior by members in the

immediate aftermath of Dr. Sumrall's death.  Giving Frank the benefit of the doubt by

treating 2005 as his first awareness of potential rights, his conduct in pursuing relief was

17

inexcusably dilatory and constituted a knowing acquiescence in existing conditions from at least 2005 to at least 2016.

The Probate Court's conclusions reflect my own — that Frank's inaction "can also be interpreted as an implied waiver of any request for the establishment and administration of an estate." [DE 336-15 at 8.]   The history amply establishes that Lester, as his father's representative, "sat idly by and delayed in attempting to preserve any claimed interest that he or his father might have had" in Dr. Sumrall's property. [*Id*.]  The Probate Court also focused on the length of time from 2005, when Lester and Frank indisputably became aware that some of Dr. Sumrall's personal property was being moved or distributed, but after which their "twelve years of silence...suggests a knowing acquiesce [*sic*] – if not outright approval – of the distribution."  [*Id*.]

Prejudice is established when there is "unavailable evidence such as destroyed records, deceased eyewitnesses, or witnesses who have no independent recollection of the event." *Oliver v. State*,  843 N.E.2d 581 (Ind.Ct.App. 2006).  That aptly describes the situation at hand. The prejudice to all those against whom the Trust now seeks relief is considerable and obvious.  Almost 23 years had passed between Dr. Sumrall's death and the Trust's assertion of claims on Frank's behalf in the April 2019 counterclaims.  By the Trust's own admission, Frank is now incapable of remembering past events.  [DE 362 at ¶71.]  Confusion in Frank's previous statements and testimony may render those unreliable, and can no longer be addressed by competent testimony from him.

18

What's more, Peter Sumrall died in 2015.  LeSEA describes him as "a key actor in the Trust's allegations and the President of the LeSEA Defendants for approximately a decade," who "could have provided valuable testimony regarding the Will, Frank's knowledge of the Will, the historic use of the Works, the Trust's allegations against him, and the creation of the *Dr. Sumrall Teaching Series* television program[.]"  [DE 339 at 32.] The death of such a witness works a prejudice to LeSEA and the individual third-party defendants.  *Angel v. Powelson*, 977 N.E.2d 434, 446-47 (Ind.Ct.App. 2012).

LeSEA also credibly complains that the passage of time has resulted in an inability to recover many records relevant to issues such as Dr. Sumrall's employment status and whether the Works constitute works for hire.  [DE 339 at 32.]  "While Defendants have gone to great lengths to locate relevant records to this issue, these records are understandably incomplete 25 years removed from Dr. Sumrall's death." [*Id.*]  Even longer ago is the creation of some of the Works identified by the Trust, many of which date back to the 1980's, with a few allegedly created in the 1970's or even early 1960's.  [DE 363-6 at 1-2.]  Producing evidence relevant to Dr. Sumrall's authorship of those documents so many decades later, particularly given the less than business-like record-keeping of the ministry entities, appears to be a near impossibility.  Because of all this, in 2018, the Probate Court also recognized the evidentiary prejudice from the passage of time: "even if it were possible to reacquire the decedent's alleged personal property, doing so would undoubtedly result in prejudice as it would create insurmountable evidentiary issues."  [DE 336-16 at 8.]

19

LeSEA has also reasonably invoked what has been called "expectations-based prejudice" from its years of investment in the use of the Works in reliance upon a belief in their rights to do so: "LeSEA and FBC are prejudiced because they undertook all the risks of failure and costs of development in promoting and investing in content that may or may not have any continuing value absent those risks and costs." [DE 339 at 33.]

On the undisputed facts of record, I conclude that Frank Sumrall unreasonably delayed for many years in asserting the rights on which the Trust's state law counterclaims are based. Frank's inaction expressed an implied waiver acquiescing in the handling of Dr. Sumrall's estate. To permit the Trust's prosecution of the counterclaims at this late date would be prejudicial to LeSEA, after changes in the availability of witnesses and evidence, and after years of reliance on and development of the assets the Trust now claims. Although the doctrine of laches is typically an equitable defense, the Indiana Supreme Court has explained that it is "equally available in suits at law." *Richmond State Hospital v. Brattain*, 961 N.E.2d 1010, 1012 (Ind. 2012), *quoting Teamsters & Employers Welfare Trust of ILL. v. Gorman Bros. Ready Mix,* 183 F.3d 877, 880-81 (7th Cir. 2002). Therefore, I find that laches bars the Trust's recovery on all of the remaining state law counterclaims whether those claims are brought at law or in equity.

One more thing: since my earliest interactions with counsel in this case, I have flagged the potential application of a laches defense to the facts of this long-playing and

unfortunate family drama.  [*See, e.g.,* DE 166 at 6 (laches was a "sensible conclusion" by the Indiana Court of Appeals, "since 20 years went by between Dr. Sumrall's passing and Lester's quixotic efforts to right a perceived wrong"); DE 310 at 9 (noting that I had raised the doctrine of laches at the preliminary injunction hearing and the parties had not yet analyzed the possibility).]  LeSEA has now squarely raised the defense in its summary judgment motion as an argument fatal to all of the Trust's claims.

Curiously, despite the prospect of such a defense hanging over the litigation for some time, the Trust has not responded to the argument.  Even after LeSEA's reply seizing upon that fact, the Trust has not sought leave to address the issue in an extra brief (something the Trust's counsel would appear to be entirely willing to do – *see* DE 155, DE 260, DE 377).  While I do not consider the defense of laches to have been conceded by the Trust, and I have applied my own independent analysis to the issue, it does appear that the Trust's failure to address laches constitutes a waiver of future arguments in opposition.  *India Breweries, Inc. v. Miller Brewing Co.*, 612 F.3d 651, 659 n.2 (7th Cir. 2010); *Witte v. Wisconsin Dept. of Corrections*, 434 F.3d 1031, 1038 (7th Cir. 2006) (failure to raise an argument in summary judgment opposition creates a lost "opportunity to urge it in both the district court and [appeals] court"), overruled on other grounds by *Hill v. Tangherlini*, 724 F.3d 965, 967 n.1 (7th Cir. 2013).

In sum, whether Stephen and Peter rooked their brother Frank out of his fair share of their Dad's estate is perhaps open to question.  But what cannot be denied is that Frank plainly slept on his rights and LeSEA has been prejudiced as a result. As a

consequence, for better or worse, it's best to just leave well enough alone and maintain the status quo. That's what the doctrine of laches mandates in this case.

**Federal Copyright Claim in Count II**

LeSEA's laches argument relies entirely on Indiana case law.  [DE 339 at 30-32.] The applicability of the doctrine to the Trust's federal copyright infringement claim requires a separate examination.  The Copyright Act contains a three-year statute of limitations:  "No civil action shall be maintained under the provisions of this title unless it is commenced within three years after the claim accrued."  17 U.S.C. §507(b).  The Supreme Court has held that the defense of laches "cannot be invoked to preclude adjudication of a claim for damages brought within the three-year window."  *Petrella v. Metro-Goldwyn-Mayer, Inc.*, 572 U. S. 663, 667 (2014).

The *Petrella* decision contains considerable discussion of how the statute of limitations functions, but the court generally found the doctrine of laches to be incompatible with the congressional determination that a three-year statute is appropriate for copyright protection purposes.  *Id*. at 677-78, 680-84.  The separate-accrual rule applicable to copyright infringement claims "makes the starting trigger an infringing act committed three years back from the commencement of suit, while laches...makes the presumptive trigger the defendant's *initial* infringing act."  *Petrella*, 572 U.S. at 681.  The court found that the long period of copyright protection combined with the three-year look-back "leaves 'little place' for a doctrine that would further limit

22

the timeliness of a copyright owner's suit."  *Id.* at 685, citing 1 D. Dobbs, Law of

Remedies §2.6(1), at 152 (2d ed. 1993).

*Petrella* is not the final word on the statute of limitations or laches for the

copyright claims in the instant case, however.  There is an important distinction

between ordinary copyright infringement claims such as the ones in *Petrella*, and suits

like this one "in which the central dispute is copyright *ownership*."  *Consumer Health*

*Information Corp. v. Amylin Pharmaceuticals, Inc.*, 819 F.3d 992, 996 (7th Cir. 2016)

(emphasis in original).  When ownership of a copyright is not in dispute and an

infringement claim focuses on the nature and scope of potentially infringing acts and

any defenses to liability, then "each infringing act is a discrete wrong triggering a new

limitations period."  *Id.* at 997.  *See also Petrella*,  572 U.S. at 671.  But copyright

ownership claims are not subject to the same separate-accrual rule.

Instead, a copyright claim based on an ownership dispute "'accrue[s] only once,'

when the claimant receives notice that his ownership has been expressly repudiated or

contested."  *Consumer Health*, 819 F.3d at 997, quoting *Seven Arts Filmed Entertainment,*

*Ltd. v. Content Media Corp. PLC*, 733 F.3d 1251, 1254 (9th Cir. 2013).  As a result, copyright

claims premised on ownership "are barred three years from the time of repudiation."

*Consumer Health*, 819 F.3d at 996 (internal quotation marks omitted).  I offered this

observation analyzing the Trust's likelihood of success in my March 3, 2022 opinion on

the Trust's emergency motion seeking to restrain LeSEA from demolishing church

property.  Opinion and Order [DE 310 at 7].

23

The gravamen of the Trust's copyright claims is Frank's assertion of rights of ownership derived by inheritance from his father, Dr. Sumrall.  Those claims accrued when he had notice that his claim of ownership was repudiated or contested.  As a practical matter, this appears to have happened shortly after Dr. Sumrall's death in 1996, when Frank says he was advised that his father had left everything to the ministry.  If not then, it surely occurred no more recently than January 2005 when Frank authorized his son, Lester, to act on his behalf to recover a previously-denied one-third share of Dr. Sumrall's estate.  Given the passage time after these events until the Trust's assertion of its claims in this 2018 action, the statute of limitations applies.   The claim of copyright infringement in Count Two, and the claim for an accounting in Count One if premised on copyright law rather than state law, are barred by the Copyright Act's statute of limitations.

### Statute of Limitations Bar to Tortious Interference Claim

My laches conclusion is dispositive of the Trust's state law claims including the tortious interference claim in Count IV.  But for completeness' sake I will give separate consideration to an issue briefed in the Trust's separate motion for partial summary judgment specifically directed to Count IV.  The motion highlights the statute of limitations applicable to that claim.  The parties agree that a tortious interference claim has a two-year statute of limitations under Ind. Code §34-11-2-4.  "A cause of action accrues, and thus the limitations period begins to run, when the claimant knew or, in the exercise of ordinary diligence, could have discovered that an injury had been

24

sustained as a result of the tortious act of another." *Gittings v. Deal*, 109 N.E.3d 963, 972 (Ind. 2018) (internal citation and quotation marks omitted). The Trust acknowledges that Frank was aware that a will existed as of December 2016. [DE 357 at ¶20.] But the tortious interference claim was not asserted until April 19, 2019, more than two years later.

The Trust contends that the statute did not begin to run until "the day the probate court denied Lester's Petition to Open the Estate of Dr. Sumrall," because as of that date "Frank had exhausted his remedies in probate court." [DE 348 at 19.] But that occurrence is not when Frank discovered that he'd been injured by any concealment of the will. Nothing in *Jackson v. McCord*, 2019 WL 10417851, at *4 (S.D.Ind. Mar. 29, 2019), a case the Trust relies upon, counsels otherwise. There the court merely noted, rather than adopted, one party's position that she "could not pursue her tortious interference claim until it was clear that the probate court could not offer an adequate remedy." *Id*.

LeSEA reasonably suggests that an old claim cannot be "preserved indefinitely and initiated at the whims of the claimant," who would "need only first be refused by the probate court." [DE 356 at 11.] "The Trust asks this Court to effectively hold that a claimant who seeks untimely relief at the probate court and is denied due to such untimeliness can cause a claim for tortious interference with an inheritance expectancy to spring into existence upon the probate court's ruling." [*Id*.] The Trust cites no supportive authority for its unpersuasive reasoning, which would be contrary to the purposes of the statute of limitations to guard against stale claims and promote finality

25

in litigation. *Shawa v. Gillette*, 209 N.E.3d 1196, 1199 (Ind.Ct.App. May 10, 2023); *Krieg DeVault LLP v. WGT V, LLC*, 206 N.E.3d 1171, 1181 (Ind.Ct.App. 2023); *Kuehl v. Hoyle*, 746 N.E2d 104, 108 (Ind.Ct.App. 2001).

Instead, accrual of the claim occurred when Frank knew, or in the exercise of ordinary diligence, could have discovered that he had been injured by the tortious act of another. *Gittings*, 109 N.E.3d at 972. The determination is generally a question of law. *Id.*, citing *Cooper Indus., LLC v. City of South Bend*, 899 N.E.2d 1274, 1280 (Ind. 2009). Even if the will had been fraudulently concealed from Frank since his father's death, any delay in the running of the statute of limitations terminated as of his awareness of the will in December 2016. When a plaintiff eventually obtains information that would lead to the discovery of the cause of action through ordinary diligence, the statute of limitations begins to run at that time, regardless of any fraudulent concealment previously perpetrated by the defendant. *Town of Cicero v. Sethi*, 189 N.E.3d 194, 211 (Ind.Ct.App. 2022).

Frank's inaction at each potential inflection point – his father's death, Lester's broaching intestate succession in 2005 after finding Andrew poaching Dr. Sumrall's belongings, and the discovery of the will in 2016 – demonstrates a failure to "exercise[] due diligence to discover the cause of action," as would be necessary to meet the burden of showing a fraudulent concealment sufficient to toll the statute of limitations. *Gittings*, 109 N.E.3d at 973. Moreover, the simple "fraud" of telling Frank that Dr. Sumrall had left all to the ministry is hardly a "trick or contrivance" sufficient to

26

"prevent inquiry or to elude investigation." *Shea v. General Motors LLC*, 567 F.Supp.3d 1011, 1021 (S.D.Ind. 2021) (internal citations omitted).

An injured party "must act with some promptness where the acts and circumstances of an injury would put a person of common knowledge and experience on notice that some right of his has been invaded or that some claim against another party might exist." *Saylor v. Reid*, 132 N.E.3d 470, 473 (Ind.Ct.App. 2019)( internal quotation marks omitted).  *See also Krieg DeVault*, 206 N.E.3d at 1182.  The discovery rule "does not mandate that plaintiffs know with precision the legal injury that has been suffered," but instead "merely anticipates that a plaintiff be possessed of sufficient information to cause him to inquire further in order to determine whether a legal wrong has occurred." *Perryman v. Motorist Mut. Ins. Co.*, 846 N.E.2d 683, 689 (Ind.Ct.App. 2006).  Frank's passivity in the face of his knowledge that he was being excluded from any inheritance from Dr. Sumrall supports the conclusion that the tortious interference claim was not timely brought within the two-year statute of limitations, and/or that it is barred by the doctrine of laches as previously discussed.  On this basis, the Trust's motion for partial summary judgment on Count IV will be denied.

## Conclusion

Counterclaim defendants LeSEA, Inc., Family Broadcasting Corporation, and LeSEA Global Feed the Hungry, Inc., and third-party defendants Stephen P. Sumrall, David M. Sumrall, Angela N. Grabowski, Andrew J. Sumrall and Adam Sumrall are granted judgment as a matter of law on Counts I, II, IV, V and VIII of the Second

Amended Counterclaim filed by The Lester Sumrall Family Trust [DE 170]. The claims for an accounting, for copyright infringement, tortious interference with expectancy, unjust enrichment and common law fraud are each barred by laches, by an applicable statute of limitations or both. Because I determine that none of the Trust's remaining counterclaims are timely brought, I do not consider other arguments made by the parties.

**ACCORDINGLY:**

Counterclaim Defendants' and Third-Party Defendants' Motion for Summary Judgment with Respect to the Trust's Claims [DE 335] is GRANTED.

Counterclaim Plaintiff the Lester Sumrall Family Trust's Motion for Partial Summary Judgment [DE 347] is DENIED.

**SO ORDERED**.

ENTERED: August 22, 2023.

_____/s/ Philip P. Simon_____
PHILIP P. SIMON, JUDGE
UNITED STATES DISTRICT COURT